USDC SCAN INDEX SHEET

















ANDY   7/31/00   10:29

3:00-CV-01516   THE UNITED STATES OF V. RELIANCE INSURANCE

*1*

*CMP.*

1  ROBERT C. NIESLEY (Bar No. 131373)
   JOSEPH C. McGOWAN (Bar No. 166426)
2  WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
   3 Park Plaza, Suite 1500
3  Irvine, California 92614
   (949) 852-6700
4
   Attorneys for Plaintiff
5  UNITED STATES OF AMERICA FOR THE USE AND
   BENEFIT OF PACIFIC COMMERCIAL SYSTEMS, INC.
6

7                    UNITED STATES DISTRICT COURT
8
                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA
9
                                  '00 CV 151 ___ (NLS)
10
   THE UNITED STATES OF AMERICA FOR) CASE NO.
11 THE USE AND BENEFIT OF PACIFIC)
   COMMERCIAL SYSTEMS, INC., a    ) COMPLAINT FOR:
12 California corporation,        ) 1.   ENFORCEMENT OF MILLER
                                  )      ACT PAYMENT BOND;
13            Plaintiff,          ) 2.   BREACH OF CONTRACT;
                                  ) 3.   OPEN BOOK ACCOUNT;
14                                ) 4.   QUANTUM MERUIT;
                                  ) 5.   ABANDONMENT OF CONTRACT
15     vs.                        )
                                  )
16                                ) **DEMAND FOR JURY TRIAL**
   RELIANCE INSURANCE COMPANY, a)
17 Pennsylvania corporation, and HUNT)
   BUILDING CORPORATION, a Texas  )
18 corporation,                   )
                                  )
19            Defendants.         )
                                  )
20 _____ )

21

22     Plaintiff, UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF

23 PACIFIC COMMERCIAL SYSTEMS, INC. ("PACIFIC COMMERCIAL SYSTEMS"), alleges

24 as follows:

25                    **JURISDICTION AND PARTIES**

26     1.   This court has jurisdiction and venue.  This court has federal

27 jurisdiction pursuant to § 1331 of Title 28 of the United States Code

28 because this case is brought under the Miller Act (40 U.S.C. § 270(a)-

1   (e)).    The  other  claims  for  relief  are  pendent,  supplemental  and

2   inextricably intertwined with the claim under the Miller Act.  The claims

3   in this case concern a federal public works construction project located

4   in Oceanside, California; thus, venue is proper in this United States

5   District Court for the Southern District of California.

6       2.   Plaintiff PACIFIC COMMERCIAL SYSTEMS is now, and was at all

7   times  in  this  complaint  mentioned,  a  corporation  duly  organized  and

8   existing under and by virtue of the laws of the State of California, with

9   its principal office and business located in the City of San Diego, County

10   of San Diego, State of California.

11       3.   Defendant HUNT BUILDING CORPORATION ("HUNT") is, and at all

12   times herein mentioned was, a corporation organized and existing pursuant

13   to the laws of the State of Texas with its principal place of business in

14   El Paso, California.

15       4.   Defendant RELIANCE INSURANCE COMPANY ("RELIANCE") is, and at all

16   times  herein  mentioned  was,  a  corporation  duly  organized  and  existing

17   under  and  by  virtue  of  the  laws  of  the  State  of  Pennsylvania,  with  its

18   principal place of business located in Pennsylvania.

19                 **FIRST CAUSE OF ACTION**

20         **(Action Upon Miller Act Payment Bond Against**

               **Defendants HUNT and RELIANCE)**

21

22       5.   Plaintiff PACIFIC COMMERCIAL SYSTEMS hereby incorporates by

  reference paragraphs 1 through 4 as though fully set forth herein.

23

24       6.   HUNT entered into a prime contract ("the Prime Contract") with

  the Department of the Navy ("the Navy") to perform the federal public

25

  works project known as the 373 Family Housing Units, Department of the

26

  Navy Contract No. N68711-96-C-2324 ("the Project").

27   ///

28

7.   PACIFIC COMMERCIAL SYSTEMS is informed and believes, and therefore alleges, that RELIANCE executed and delivered as surety a certain payment bond ("the Payment Bond") in the penal sum of $2,500,000, guarantying the payment to all persons supplying labor or materials in the prosecution of the work on said Project.

8.   On or about April 15, 1999 and during the course of the performance and prosecution of said public work, PACIFIC COMMERCIAL SYSTEMS entered into a written subcontract ("the Subcontract") with defendant HUNT, pursuant to which PACIFIC COMMERCIAL SYSTEMS agreed to install Rough Framing as required for 373 Family housing units to HUNT at its special instance and request, which said labor was for the benefit of said Project.  Under the Subcontract, HUNT was required to _timely supply all materials,_ including "all dimensional lumber, APA rated sheathing, beams, parallams, truss joist, roof trusses, vents and louvers, sill sealer, window flashing, pre-hung exterior doors with frames, sliding glass doors and windows."  A copy of the Subcontract is attached hereto as Exhibit "A" and incorporated herein.

9.   Pursuant to the Subcontract, HUNT agreed to pay PACIFIC COMMERCIAL SYSTEMS $2,589,000 for said labor performed and materials supplied by PACIFIC COMMERCIAL SYSTEMS and for "additions and deductions for changes" in the work of the Subcontract.

10.   PACIFIC COMMERCIAL SYSTEMS is informed and believes, and thereupon alleges, that it duly performed or was excused from performing all things and conditions on its part to be performed under the Subcontract.

11.   PACIFIC COMMERCIAL SYSTEMS is informed and believes, and thereupon alleges, that HUNT breached and/or abandoned the Subcontract,

paying only $139,000 and leaving an unpaid balance now due and owing to PACIFIC COMMERCIAL SYSTEMS in the sum of $721,800.

12. The work furnished by PACIFIC COMMERCIAL SYSTEMS was and is reasonably worth the sum of $860,800. Only the sum of $139,000 has been paid, leaving a balance due and owing to PACIFIC COMMERCIAL SYSTEMS, for and on account thereof, in the sum of $721,800, after deducting all just credits and offsets.

13. Demand was made on RELIANCE by PACIFIC COMMERCIAL SYSTEMS on July 13, 2000, 1999 by a courier providing verification of delivery. A copy of said demand is attached hereto as Exhibit "B."

14. PACIFIC COMMERCIAL SYSTEMS is informed and believes, and thereupon alleges, that it duly performed or was excused from performing all things and conditions on its part to be performed under the Payment Bond.

15. RELIANCE has not paid PACIFIC COMMERCIAL SYSTEMS for said labor or materials furnished, as aforesaid; and the balance thereof unpaid at the time of the commencement of this action is $721,800.

16. Less than one year and more than ninety (90) days have elapsed after the date on which the last of said framing work was furnished as hereinabove set forth.

### SECOND CAUSE OF ACTION

#### (Breach of Contract Against Defendant HUNT)

17. Plaintiff PACIFIC COMMERCIAL SYSTEMS hereby incorporates by reference paragraphs 1 through 16 as though fully set forth herein.

18. Pursuant to the Subcontract, PACIFIC COMMERCIAL SYSTEMS agreed to furnish equipment, supervision and labor necessary to perform certain wood framing on the PROJECT. HUNT agreed to pay $2,589,000, "subject to

4

additions and deductions for changes ..." in the work of PACIFIC COMMERCIAL SYSTEMS on the Project.

19. PACIFIC COMMERCIAL SYSTEMS is informed and believes, and thereupon alleges, that it duly performed or was excused from performing all things and conditions on its part to be performed under the Subcontract.

20. PACIFIC COMMERCIAL SYSTEMS is informed and believes, and thereupon alleges, that defendant HUNT has breached the Subcontract, *inter alia*, by:

> A. Failing to pay all amounts due to PACIFIC COMMERCIAL SYSTEMS under the Subcontract;
>
> B. Failing to make timely and complete progress payments;
>
> C. Failing to timely pay for change orders;
>
> D. Failing to comply with the requirements of the implied covenants;
>
> E. Failing to obtain necessary acts or omissions from third parties whose consent and cooperation was required to enable PACIFIC COMMERCIAL SYSTEMS to timely perform;
>
> F. Requiring PACIFIC COMMERCIAL SYSTEMS to provide labor, services, equipment and materials other than those prescribed in the Subcontract without compensation therefor;
>
> G. Requiring PACIFIC COMMERCIAL SYSTEMS to provide labor, services, equipment and materials beyond the requirements of the Subcontract without properly negotiating and issuing change orders therefor;
>
> H. Failing to timely perform the things and conditions to be performed by defendants on their part, including without

5

limitation, the timely supply of trusses, lumber, structural units, windows, doors, and other materials;

I.  Interfering with or otherwise disrupting, delaying and accelerating the performance by PACIFIC COMMERCIAL SYSTEMS of the Subcontract;

J.  Exercising the authority and discretion allowed to defendants under the Subcontract in an unreasonable, arbitrary and capricious manner;

K.  Adding or deducting to the Subcontract a quantity of labor, services, equipment and materials which was so significant that it changed the nature of the Project which PACIFIC COMMERCIAL SYSTEMS had contracted to do;

L.  Providing plans, specifications and other materials concerning the Project, as a basis for bidding thereon and entering into the Subcontract, which were not accurate, workable, and correct;

M.  Making representations of fact in the plans, specifications and other materials concerning the Project which defendant provided to PACIFIC COMMERCIAL SYSTEMS, which representations (a) were untrue; (b) failed to disclose other facts which either materially qualified them or rendered them likely to mislead PACIFIC COMMERCIAL SYSTEMS; or (c) failed to disclose other facts which were known or accessible only to defendant and which defendant knew were not known to, or reasonably discoverable by, PACIFIC COMMERCIAL SYSTEMS;

N.  Failing to provide final and complete working drawings and specifications; and

6

O.   Terminating the Subcontract absent legal grounds
     for termination.

21.  As a direct and proximate result of the aforementioned breaches by defendants, PACIFIC COMMERCIAL SYSTEMS:

A.   Has not been paid the balance due under the Subcontract and has lost the use of that money;

B.   Has lost the use of progress payments which were not timely paid (31 U.S.C. § 3905(e)(4)) and the interest that would have been earned on the retention portion of those progress payments if that portion had been timely paid;

C.   Has lost profits that would have been earned on the Subcontract and that would have been earned on other contracts but for the additional commitment required for this Subcontract;

D.   Incurred expenses to provide labor, services, equipment and materials (plus overhead thereon and lost profits therefor), which were not required under the Subcontract;

E.   Incurred additional expenses (plus overhead thereon and lost profits therefor) for the performance of the Subcontract due to disruption, delay and acceleration of the Project;

F.   Suffered expenses and damages on account of claims and demands from subcontractors, suppliers and laborers;

G.   Incurred expenses to provide labor, services, equipment and materials (plus overhead thereon and lost profits therefor), which were only required by deviations in the nature and extent of the Project from the way it had been presented in the plans, specifications and other materials

7

1  given to PACIFIC COMMERCIAL SYSTEMS to use to determine its
2  bid;

3  H.  Provided labor, services, equipment and materials to and
4  for the Project in excess of what PACIFIC COMMERCIAL
5  SYSTEMS should have had to furnish, because PACIFIC
6  COMMERCIAL SYSTEMS entered into the Subcontract at a lower
7  price than it would have otherwise bid; and

8  I.  Incurred costs, expenses and attorneys' fees to collect
9  amounts reasonably due from defendants.

10  J.  Incurred interest expense in borrowing funds to pay Project
11  debts.

12  22.  All of the above PACIFIC COMMERCIAL SYSTEMS's damages are in an
13  amount not yet fully ascertained (but approximately $721,800) and when
14  ascertained this pleading will be amended to state the correct amount,
15  plus prejudgment interest thereon at the lawful rate, plus applicable
16  penalties under 31 U.S.C. § 3905 (e)(4).  PACIFIC COMMERCIAL SYSTEMS has
17  demanded payment therefor from defendants but defendants have failed and
18  refused, and continue to fail and refuse, to pay.

19  23.  In order to present this claim and prosecute this action,
20  PACIFIC COMMERCIAL SYSTEMS has been compelled to employ attorneys.
21  PACIFIC COMMERCIAL SYSTEMS is entitled to be reimbursed for its reasonable
22  attorneys' fees, *inter alia*, because the Subcontract provides for
23  attorneys' fees, court costs and other associated costs to be awarded to
24  the prevailing party.

25  **THIRD CAUSE OF ACTION**

26  **(Open Book Account Against Defendant HUNT)**

27  24.  Plaintiff PACIFIC COMMERCIAL SYSTEMS hereby incorporates by
28  reference paragraphs 1 through 23 as though fully set forth herein.

8

1       25.  Within the four (4) year period immediately last past; at San

2 Diego County, California, defendant HUNT became indebted to PACIFIC

3 COMMERCIAL SYSTEMS on an open book account for construction work, labor

4 and materials provided by PACIFIC COMMERCIAL SYSTEMS to said defendants at

5 the special instance and request of said defendants, for the sum of

6 $800,800.

7       26.  Only the sum of $139,000 has been paid despite demand therefor

8 made by PACIFIC COMMERCIAL SYSTEMS to the aforesaid defendants for the

9 balance owing, and there is now due, owing and unpaid the sum of $661,800,

10 together with interest thereon at the maximum rate allowed by law.

11 **FOURTH CAUSE OF ACTION**

12 **(Quantum Meruit Against Defendant HUNT)**

13       27.  Plaintiff PACIFIC COMMERCIAL SYSTEMS hereby incorporates by

14 reference paragraphs 1 through 26 as though fully set forth.

15       28.  Within the two (2) year period immediately last past, in the

16 County of Los Angeles, State of California, PACIFIC COMMERCIAL SYSTEMS

17 provided construction work, labor and materials to defendant HUNT at the

18 special request of said defendant, for which said defendant then and there

19 promised to pay PACIFIC COMMERCIAL SYSTEMS the reasonable value of such

20 construction work, labor and materials.

21       29.  At all times herein mentioned, the above construction work was

22 and is of the reasonable value of $800,800.  Only the sum of $139,000 has

23 been paid, notwithstanding that PACIFIC COMMERCIAL SYSTEMS has demanded

24 full payment therefor, and consequently, there is now due, owing and

25 unpaid from said defendants to PACIFIC COMMERCIAL SYSTEMS the sum of

26 $661,800, together with interest thereon at the maximum rate allowed by

27 law.

28 ///

**FIFTH CAUSE OF ACTION**

**(Abandonment of Contract Against Defendant HUNT)**

30.   Plaintiff PACIFIC COMMERCIAL SYSTEMS incorporates herein by this reference each and every allegation contained in paragraphs 1 through 29, inclusive, as through fully set forth herein.

31.   Throughout the course of the construction of the Project, changes were made in the Subcontract work and schedule which were vastly different from and contrary to the work and schedule shown by the contract documents and agreed upon by the parties at the time the Subcontract was entered into by plaintiff PACIFIC COMMERCIAL SYSTEMS.   Such changes were major and on-going, and seriously impacted all of the work of plaintiff PACIFIC COMMERCIAL SYSTEMS in terms of the efficient use of labor and equipment, and the planned use of same on the Project.   Moreover, the items alleged herein had extensive ripple effects adversely affecting productivity and costs.

32.   Defendant HUNT failed and refused to perform the duties under the Subcontract to provide concrete trusses, doors, windows and other items, to issue directions, corrections, change orders, extensions of the Subcontract for the items related herein.   HUNT repeatedly left plaintiff PACIFIC COMMERCIAL SYSTEMS adrift to adapt on its own to lengthy delays and other changes.   By so acting, defendants abandoned the Subcontract, and by continuing to work under those circumstances, plaintiff PACIFIC COMMERCIAL SYSTEMS accepted that abandonment of the Subcontract.

33.   As a result of the abandonment of the Subcontract, including the abandonment of the contract price and the abandonment of the disputes clause, plaintiff PACIFIC COMMERCIAL SYSTEMS is entitled to bring suit in District Court and recover for its work on a quantum meruit basis of its actual direct costs plus fifteen percent(15%) for its overhead and ten

10

1 percent (10%) for its profit, less payments actually received from the
2 defendants.

3     **WHEREFORE, PACIFIC COMMERCIAL SYSTEMS prays for judgment as follows:**

4                 **FIRST THROUGH FOURTH CAUSES OF ACTION**

5     1.   For judgment against defendants HUNT and RELIANCE on the payment
6 bond, jointly and severally, in the amount of $661,800;

7     2.   For interest thereon at the prevailing legal rate;

8     3.   For statutory penalties pursuant to 31 U.S.C. § 3905(e)(4), and
9 as otherwise allowed by law;

10    4.   For attorneys' fees and costs; and

11    5.   For such other and further relief as the court deems just and
12 proper.

13                      **FIFTH CAUSE OF ACTION**

14    1.   For judgment against defendant HUNT according to proof;

15    2.   For interest thereon at the prevailing legal rate;

16    3.   For statutory penalties pursuant to 31 U.S.C. § 3905(e)(4), and
17 as otherwise allowed by law;

18    4.   For attorneys' fees and costs; and

19    5.   For such other and further relief as the court deems just and
20 proper.

21 Dated: July 26, 2000            WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
                                   Robert C. Niesley
22                                 Joseph C. McGowan

23

24                      By:  _____
25                           Attorneys for Plaintiff, UNITED STATES OF
                             AMERICA FOR THE USE AND BENEFIT OF
26                           PACIFIC COMMERCIAL SYSTEMS, INC.

27

28

                                    11

1

**DEMAND FOR JURY TRIAL**

2

3     Plaintiff, UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF

4  PACIFIC COMMERCIAL SYSTEMS, INC. demands a trial by jury, pursuant to

5  Federal Rule of Civil Procedure 38(b).

6

7  Dated: July 26, 2000          WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
                                  Robert C. Niesley
8                                 Joseph C. McGowan

9

10                       By: _____

                              Attorneys for Plaintiff, UNITED STATES OF
11                            AMERICA FOR THE USE AND BENEFIT OF
                              PACIFIC COMMERCIAL SYSTEMS, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Legal Tabs Co. 1-800-322-3022

Recycled    Stock # EXA-5-B



**HUNT**
BUILDING CORPORATION

4401 NORTH MESA • SUITE 201 • COVENTRY PARK WEST • EL PASO, TEXAS 79902-1107 • P.O. BOX 12228 • EL PASO, TEXAS 79913-0220 • (915) 533-1122

THIS AGREEMENT, MADE THIS ___15th___ day of ___April___, 19__99__, by and between
Pacific Commercial Systems, Inc., doing business as a _corporation_,
with principal office at _1001 San Marcos Blvd., #215, San Marcos, CA 92069_, (hereinafter called the
"SUBCONTRACTOR"), and HUNT BUILDING CORPORATION (hereinafter called "CONTRACTOR"), WITNESSETH:

That the SUBCONTRACTOR and the CONTRACTOR, in consideration of the covenants and agreements herein contained, mutually
agree as follows:

1. PROJECT, LOCATION AND OWNER

The SUBCONTRACTOR agrees to furnish all labor, material and equipment and perform all work described in Section 2 hereof for
the construction of          373 Family Housing Units

located at          Wire Mountain, Camp Pendleton, California

for          Department of the Navy
          Contract No. N68711-96-C-2324

hereinafter called OWNER, in accordance with the terms of the subcontract, and in accordance with the terms of the general contract
between the OWNER and the CONTRACTOR.

2. WORK TO BE DONE

The SUBCONTRACTOR and the CONTRACTOR agree that the materials and/or services to be furnished and the work to be done
by the SUBCONTRACTOR are:

THE FOLLOWING IS INTENDED AS AN ELABORATION, NOT LIMITATIONS, OF THE
SCOPE OF WORK TO BE INCLUDED AS PART OF THIS SUBCONTRACT.

1.   Subcontractor shall furnish all supervision, labor, tools, equipment, fuel, incidentals,
     insurance, applicable taxes, permits and fees, for the complete installation of **Rough
     Framing** as required for 373 family housing units at Camp Pendleton, CA. All shall
     be complete except as hereinafter excluded. This work shall be in strict compliance
     with the Approved For Construction Plans dated 31 March 1999, the Approved For
     Construction Specifications, Request for Proposal   (RFP) N68711-96-R-2324
     including Amendments 0001 and 0002, this Subcontract, all state and local laws,
     codes, ordinances and regulations and applicable standards in effect on the date of
     this Subcontract. The above referenced items are supplementary to each other but
     in the event of a conflict and/or omission, if any, the more stringent requirement shall
     govern. This work shall be performed on three separate sites which will run
     concurrently.

          <u>A COMPLETE JOB OF ROUGH FRAMING IS INTENDED</u>

          ATTACHMENT A - WORK TO BE DONE (continued on page 9)

3. CONTRACT SUM

IN CONSIDERATION WHEREOF, the CONTRACTOR agrees to pay the SUBCONTRACTOR for the full and faithful performance
of his work the sum of   TWO MILLION, FIVE HUNDRED EIGHTY NINE THOUSAND   DOLLARS AND NO CENTS--

Dollars ($2,589,000.00) in current funds, at CONTRACTOR'S office in El Paso, Texas, subject to additions and deductions for
changes as may be agreed upon in writing and subject to the other terms of this agreement.

4. TERMS AND CONDITIONS

Sections 5 thru___60___contained on pgs. 2 thru___8___attached hereto are a part of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement for themselves, their heirs, executors, successors, administrators
and assigns on the day and year first above written.

PACIFIC COMMERCIAL SYSTEMS, INC.                    HUNT BUILDING CORPORATION
_____                    _____
          SUBCONTRACTOR

By _Lynda Wilson_                          By _____

Title _Controller/Sole Director_          Title David K. Wray, Vice President

ATTEST _____            No. 15624

Fed. Tax I.D. No. _330655982_

HBC FORM C209 1/99

Pay    t on a weekly basis for work i    lace based upon schedule

5. PROGRESS PAYMENTS    of values per David Wray

Providing the SUBCONTRACTOR'S work and rate of progress are satisfactory to OWNER and CONTRACTOR, and subject to the other terms of this agreement, installment payments hereunder shall be made at the office of the General Contractor in El Paso, Texas within 10 days after receipt by CONTRACTOR of OWNER'S weekly progress payment. SUBCONTRACTOR shall submit to CON-TRACTOR applications for progress payments in form prescribed by CONTRACTOR and within a reasonable time to enable CON-TRACTOR to apply for payment to the OWNER. Payments shall be in an amount equal to the value of work performed and material suitably stored at the site as of the 25th of the previous month, as such value is determined by OWNER or its representative, less retainage as allowed by the OWNER and less prior payments.

6. CONDITIONS OF PAYMENTS

CONTRACTOR shall be under no obligation to pay SUBCONTRACTOR for any work done hereunder, until CONTRACTOR has been paid therefor by OWNER, and the provisions hereof stating the time of progress and final payments and the amount thereof are subject to the condition that CONTRACTOR shall have received from OWNER progress and/or final payments in at least the amounts payable to SUBCONTRACTOR on account of work done by SUBCONTRACTOR hereunder; otherwise the time when such payments shall be due SUBCONTRACTOR shall be postponed until CONTRACTOR has received same from OWNER. SUBCONTRACTOR shall not be entitled to receive final payment hereunder until the entire work to be done hereunder has been accepted and paid for and SUBCON-TRACTOR has delivered to CONTRACTOR a complete release of any and all claims against the CONTRACTOR. The SUBCONTRAC-TOR agrees that moneys received for the performance of this Subcontract shall be used first for labor and material entering into this work and said moneys shall not be diverted to satisfy obligations of the SUBCONTRACTOR on other contracts. The terms of payment provided herein shall not make it incumbent on the CONTRACTOR to make payments in an amount that would not leave a sufficient balance to cover the retained percentage together with an amount sufficient to satisfy all obligations of the SUBCONTRACTOR for labor, materials, etc., furnished or to be furnished by him under this Subcontract. Final payment for and acceptance of the work by the OWNER shall not relieve SUBCONTRACTOR of liability for defects in said work which may thereafter be discovered, or for which the OWNER may be entitled to indemnification against.

7. PROGRESS SCHEDULE AND REQUIREMENTS

The SUBCONTRACTOR expressly covenants and agrees to keep himself thoroughly informed as to the progress of the job, to begin work within 5 days after notification by the CONTRACTOR, to prosecute the work continuously and uninterruptedly with all possible speed, and to complete the entire work covered by this Subcontract at such time as to not interfere with or delay performance of the General Contract or the work of any other Subcontractor. In the event the SUBCONTRACTOR fails to carry on such work at such rates of progress as are specified under the terms hereof, the CONTRACTOR may at its option require the SUBCONTRACTOR to increase the number of men and/or the amount or equipment employed in the performance of said work. The SUBCONTRACTOR agrees to reimburse the CONTRACTOR for any penalties or liquidated damages for delay that the CONTRACTOR may be required to pay to the OWNER as a result of the SUBCONTRACTOR'S failure to perform and/or complete this work within the time specified. The SUBCONTRACTOR acknowledges that the completion date provided for in the General Contract and time table or progress chart or schedule for the performance of the work prepared by the CONTRACTOR are reasonable and thoroughly understood.

8. MATERIALS

The SUBCONTRACTOR agrees to furnish all materials, supplies, including samples required to properly carry out and perform the work specified herein, and upon request to furnish the CONTRACTOR with copies of purchase orders, invoices, correspondence and other evidence of source, date of procurement, expediting effort, and date and method of shipment for all materials incorporated into the work. The SUBCONTRACTOR agrees to include in all his purchase orders and subcontracts for materials or services for this project the provisions of the General Contract and this Subcontract, the Contract number, project title, and priority rating if any. The SUBCON-TRACTOR agrees to furnish materials strictly complying to the requirements, plans and specifications and to promptly replace any material rejected by the OWNER or OWNER'S representative. The approval by the CONTRACTOR or OWNER of shop drawings, manufac-turer's literature, etc., or the incorporation of the material into the work, shall not relieve the SUBCONTRACTOR from furnishing materials conforming to the aforementioned requirements. The SUBCONTRACTOR agrees to pay all freight, storage, taxes, or other incidental expenses associated with his materials. All materials stored at the job site shall be at the risk of the SUBCONTRACTOR and stored only where and when directed by the CONTRACTOR. The CONTRACTOR assumes no responsibility of liability for materials received or stored by it on behalf of and in accommodation to the SUBCONTRACTOR.

9. WORKMEN

The SUBCONTRACTOR will employ only qualified, experienced, sober mechanics of the proper trades in sufficient numbers to ac-complish the work in the required time. The CONTRACTOR may require the SUBCONTRACTOR to increase the number of workmen or hours of work if necessary to bring the SUBCONTRACTOR'S progress up to the prescribed schedule. The CONTRACTOR may require the removal from the job of any workman the CONTRACTOR reasonably finds objectionable.

10. TOOLS AND EQUIPMENT

The SUBCONTRACTOR agrees to furnish and maintain in first-class operating condition a sufficient amount of equipment, machinery, tools, and implements of the proper type necessary to perform the work herein specified. The SUBCONTRACTOR shall not place on the work any equipment of which he is not the sole owner unless he obtains written permission from the CONTRACTOR. The SUBCON-TRACTOR assumes full responsibility for loss or damage of any nature to his equipment while in use or stored at the job site. Unless otherwise provided, the SUBCONTRACTOR shall furnish, erect, dismantle, and remove such scaffolding, ladders, runways, staging, etc. as may be required by his work.

11. SUPERVISION

The SUBCONTRACTOR shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfac-tory to the CONTRACTOR, on the work at all times during construction, with authority to act for him.

12. INSURANCE AND LIABILITY FOR LOSS

The SUBCONTRACTOR shall carry and pay for (1) workmen's compensation insurance and (2) public liability insurance, including but not restricted to motor vehicles, consisting of both bodily injury and property damage coverage and including contractual liability coverage in sums and with limits and with companies acceptable to CONTRACTOR. SUBCONTRACTOR shall furnish CONTRAC-TOR with copies of these policies or with certificates showing names of the carriers, amounts and numbers of the policies, and expiration dates before commencing work. The CONTRACTOR shall pay for and maintain a Builder's Risk Policy insurance against loss by fire, storm, etc., from which the SUBCONTRACTOR shall receive his pro rata share in the event of a loss. However, the CONTRACTOR assumes no responsibility for any such losses excluded or deductible from such policy. The SUBCONTRACTOR shall effectually secure and protect his material and work and shall bear and be liable for all loss and/or damage of any kind in connection therewith at any time prior to the final completion and acceptance thereof, unless said loss or damage is caused by direct negligence of the CONTRAC-TOR. The SUBCONTRACTOR shall reimburse the CONTRACTOR on demand for any breakage or other damage to other work or materials occasioned by the SUBCONTRACTOR in the execution of this Subcontract.

13. TAXES, ETC.

The SUBCONTRACTOR agrees to pay and does hereby accept full and exclusive liability for any and all taxes, contributions, fees, permits, licenses, fines, duties, excises, etc., occasioned by his work regardless of by whom imposed and regardless of how measured.

14. CLEANUP

The SUBCONTRACTOR shall clean up and remove from the site as directed by the CONTRACTOR, all rubbish and debris resulting from his work. He shall clean up to the satisfaction of the inspectors, all dirt, grease, marks, etc., from walls, ceilings, floors, fixtures, etc., deposited or placed thereon as a result of the execution of this Subcontract. If the SUBCONTRACTOR refuses or fails to perform this cleaning as directed by the CONTRACTOR, the CONTRACTOR shall have the right and power to proceed with said cleaning, and the SUBCONTRACTOR will on demand repay to the CONTRACTOR the actual cost of said work plus 15% of such cost to cover supervision, insurance, overhead, etc.

15. SUBCONTRACTOR'S ACCEPTANCE OF THE WORK OF PRECEDING TRADES

The SUBCONTRACTOR shall satisfy himself as to the acceptability of the work or surfaces to which his work is to be applied or affixed, and shall advise the CONTRACTOR in writing of any unsatisfactory conditions therein. Commencement of the work by the SUBCON-TRACTOR shall be construed as acceptance by him of the preceding work.

16. CHANGES AND EXTRAS

CONTRACTOR may, at any time, by written order and without notice to the Sureties, make changes in the work which SUBCONTRAC-TOR shall proceed with as directed. If such changes cause an increase or decrease in the Contract price or in the time required for perfor-mance, an equitable adjustment shall be made and this Contract shall be modified in writing accordingly, all subject, however, to the terms of Section 18 below. However, nothing herein contained shall excuse the SUBCONTRACTOR from proceeding with the prosecu-tion of the work as changed.

17. BACKCHARGES

The SUBCONTRACTOR agrees to pay reasonable backcharges (based on actual cost plus 15% for supervision, overhead, and taxes) for any special services, equipment, cleanup, or any cutting, patching, and repairs made necessary by the omissions, mistakes, accidents, or negligence of the SUBCONTRACTOR. Commensurate with the urgency, nature and scope of the backcharge, the CONTRACTOR shall give the SUBCONTRACTOR advance notice of the intended backcharge, but such advance notice shall not be a prerequisite for making such backcharges against the SUBCONTRACTOR.

18. CLAIMS

The SUBCONTRACTOR agrees to make any claims for extensions of time, additional work, changed conditions or damages for delays, or otherwise, to the CONTRACTOR in the same manner as provided in the General Contract for like claims of the CONTRACTOR upon the OWNER, and in such time as will enable the CONTRACTOR to transmit such claims to the OWNER for payment or recogni-tion: and the CONTRACTOR will not be liable to the SUBCONTRACTOR on any claim not timely or properly submitted, or until allowed by the OWNER. In case of any dispute arising under the General Contract, SUBCONTRACTOR agrees to be bound to CON-TRACTOR to the same extent that CONTRACTOR is bound to OWNER by the terms of the General Contract and by any and all decisions or determinations made thereunder by the party or board so authorized in the General Contract. SUBCONTRACTOR also agrees to be bound to CONTRACTOR to the same extent the CONTRACTOR is bound to OWNER by the decision of a court or board of competent jurisdiction, whether or not SUBCONTRACTOR is a party to such proceeding. If such dispute is prosecuted or defended by CONTRACTOR against OWNER under the terms of the General Contract or in court action, SUBCONTRACTOR agrees to furnish all documents, statements, witnesses and other information required by CONTRACTOR for such purpose and to pay or reimburse CON-TRACTOR for all expense costs, and attorney's fees incurred in connection therewith. It is expressly understood that as to any and all work done and agreed to be done by the SUBCONTRACTOR, and as to any and all materials or services furnished or agreed to be furnished by SUBCONTRACTOR, and as to any and all damages, if any, incurred by SUBCONTRACTOR, in connection with this construction project, CONTRACTOR shall never be liable to SUBCONTRACTOR to any greater extent than OWNER is liable to CON-TRACTOR. No dispute shall interfere with the progress of construction and SUBCONTRACTOR shall proceed with its work as directed.

19. ASSIGNMENT OR SUBLETTING

The SUBCONTRACTOR agrees not to assign this Subcontract or any money due or to become due to the SUBCONTRACTOR or to subcontract any portion of the work covered by this Subcontract without first obtaining the CONTRACTOR'S written consent.

20. APPLICABLE DOCUMENTS

Insofar as the provisions of the General Contract do not conflict with the specific provisions herein contained, they and each of them are hereby incorporated into this Subcontract as fully as if completely written herein. The SUBCONTRACTOR agrees that he will per-form this agreement so as not to violate any terms of the General Contract. The relationship of the SUBCONTRACTOR hereunder towards the CONTRACTOR shall be the same as that of the CONTRACTOR towards the OWNER under said General Contract and the relationship of the CONTRACTOR hereunder to the SUBCONTRACTOR shall be the same as that of the OWNER towards the CONTRACTOR under the General Contract. This Subcontract is predicated upon all documents comprising the General Contract, a copy of which is available for inspection at the offices of the CONTRACTOR, and shall include all drawings and revisions thereto, all specifications including addenda and amendments thereto, and all contract modifications dated on or prior to the date of this Subcon-tract. The SUBCONTRACTOR acknowledges that he is thoroughly familiar with the requirements of these documents, site conditions, job requirements, availability of labor and materials in the locality of the project and his acceptance of this Subcontract is based solely on his own knowledge and judgment and not on the representation of the CONTRACTOR, OWNER, or other parties.

21. PRECEDENCE OF THIS SUBCONTRACT

This Subcontract takes precedence over all proposals, correspondence, and oral agreements made prior to the date hereof and constitutes the entire understanding and agreement of the parties.

22. SUBCONTRACTOR'S RELATIONSHIP TO OWNER

The SUBCONTRACTOR will have no direct dealings with the OWNER during the life of this Subcontract. All submittals, correspondence, changes, extras, payroll reports, claims, complaints, and any other matters will be directed to and through the CONTRACTOR. The SUBCONTRACTOR and his representatives are cautioned against expressing to the OWNER or his agent any unfavorable opinions concerning workmanship, progress, management, procedures, or organization, etc., of the CONTRACTOR or any other subcontractors or trades employed on the work.

23. GUARANTEES

The SUBCONTRACTOR agrees to guarantee the workmanship and materials against defects as provided for in the General Contract,

but in any event not less than for a period of one year from the date of final acceptance of the overall project. SUBCONTRACTOR agrees to furnish all guarantees, bonds, operating instructions, etc., as required by the specifications and/or General Contract.

### 24. UTILITIES AND SANITARY FACILITIES

The CONTRACTOR shall furnish to the SUBCONTRACTOR at the job site, unless otherwise provided, adequate water ~~both~~ for the work ~~and for drinking, electrical energy for the operation of tools, etc.~~, and sanitary toilet facilities. These facilities will be available at the location selected by the CONTRACTOR, and shall be of the type determined by the CONTRACTOR. The CONTRACTOR assumes no liability for injury or damage arising out of the use of these facilities by the SUBCONTRACTOR.

### 25. SAFETY REQUIREMENTS AND LABOR PROVISIONS

The SUBCONTRACTOR agrees to abide by and comply with all FEDERAL and state labor, occupational, safety and health laws and the safety programs prescribed by the OWNER and/or the CONTRACTOR. The SUBCONTRACTOR shall insure that all machines are properly equipped with the manufacturer's recommended guards and safety devices, are in safe condition, and operated in the prescribed manner. The SUBCONTRACTOR agrees to comply with all Labor Standard Provisions, and all Equal Opportunity, non-discrimination and non-segregation clauses of the General Contract which by reference are incorporated herein. In the absence of any labor provisions in the prime contract, the SUBCONTRACTOR agrees to be bound by regulations prescribed by law in the locality of the job site, including but not limited to, the Fair Labor Standard Act, the Civil Rights Act of 1964, and the Occupational Safety and Health Act of 1970. SUBCONTRACTOR shall be liable to CONTRACTOR for any damages or delays resulting from SUBCONTRACTOR'S failure to comply with such laws and/or requirements. In the prosecution of the Work, SUBCONTRACTOR agrees to recognize and comply with all agreements of the CONTRACTOR with local trade councils and/or separate unions concerning labor and working conditions and otherwise applicable to this work, insofar as these agreements do not conflict with or violate any local, State or Federal laws or properly constituted orders or regulations pertaining to this project. SUBCONTRACTOR is familiar with the applicable local State and/or Federal laws in relation to wages and hours, and where such laws apply to the Work, the SUBCONTRACTOR shall comply with the terms and provisions thereof and shall hold the CONTRACTOR harmless from any loss, liability, and expense arising out of any violations of the same by the SUBCONTRACTOR.

### 26. HOLD HARMLESS

The SUBCONTRACTOR agrees to save harmless the CONTRACTOR, and/or OWNER, from all liability for injuries to any and all persons, employees and/or property, and from damages by any fire in any way caused by SUBCONTRACTOR, his agents, employees, suppliers, subcontractors or their employees or agents, or persons, firms or corporations to whom SUBCONTRACTOR further sublets work, caused by, or incidental to, the execution of the work, and from all injuries, damages, judgments, charges and other related expenses arising, or to arise, through any act or omission of SUBCONTRACTOR or any of the said parties and SUBCONTRACTOR does expressly assume, with respect to the work to be done hereunder, all of the liability imposed on the CONTRACTOR by the provisions of the said construction contract between CONTRACTOR and OWNER. If there are any such claims unsettled upon completion of this Subcontract, final settlement between the CONTRACTOR and the SUBCONTRACTOR may be deferred at the option of the CONTRACTOR until such claims are adjusted or such indemnity acceptable to the CONTRACTOR is furnished by the SUBCONTRACTOR. The SUBCONTRACTOR shall hold and save the CONTRACTOR harmless for any liability including costs and expenses, for or on account of any patented or unpatented invention, article or appliance manufactured or used in the performance of this Subcontract, including their use by the OWNER.

### 27. LIEN WAIVERS AND AFFIDAVITS

The SUBCONTRACTOR shall furnish the CONTRACTOR with such partial releases and waivers of lien from his material-men and creditors as the CONTRACTOR may require from time to time on labor, and/or material and/or other claims, and final releases and waivers of lien at the time of final payment on this Subcontract. The SUBCONTRACTOR agrees to furnish such sworn affidavits as may be required by the CONTRACTOR attesting to the SUBCONTRACTOR'S financial condition as relates to this Subcontract indicating amounts paid and owing for labor, materials, and other expenses. Such waivers and affidavits shall be a prerequisite for partial and final payments.

### 28. SHOP DRAWINGS AND REPORTS

The SUBCONTRACTOR agrees to submit promptly and accurately in the prescribed form, number, manner, and time, all shop drawings, as-built drawings, payroll reports, certificates, guarantees, descriptive literature, cuts, operating instructions, test reports, or other documents required by the General Contract. The SUBCONTRACTOR agrees to reimburse the CONTRACTOR for any expenses, interest or penalties occasioned the CONTRACTOR by the delay, inaccuracy, ommisions, or negligence on the part of the SUBCONTRACTOR in connection with the submission of the abovementioned documents.

### 29. DEFAULT BY SUBCONTRACTOR

Should the SUBCONTRACTOR fail to deliver any part of the necessary materials and/or perform any part of the necessary work within the time schedule prescribed by the CONTRACTOR in Section 7 above, or fail to perform or comply with any term, covenant, or condition contained in this Subcontract or in the General Contract, or abandon the work, or shall become insolvent or shall appear insolvent in the opinion of the CONTRACTOR, or shall have a claim or lien filed on or against him, or shall have a judgment filed against him, or make an assignment for benefit of creditors, or have a petition in bankruptcy filed by or against him, or shall die or become mentally or physically disabled, the CONTRACTOR shall have the right, if he so elects, to declare this Subcontract in default by telegraphic notice to the SUBCONTRACTOR at his last known address. Unless the SUBCONTRACTOR corrects such default or satisfies the CONTRACTOR of his ability to do so within 72 hours after such telegraphic notice, the CONTRACTOR may, if it so elects, and without prejudice to any other right or remedy it may have, terminate this Subcontract and take whatever steps it deems advisable to secure necessary labor and material by contract or otherwise, and may take over, together with all rights and title thereto, all of said SUBCONTRACTOR'S equipment, tools, supplies on the job site or enroute thereto, and may prosecute the work to completion. All moneys expended therefor including (but not restricted to) cost of supplies, equipment, materials, subcontracts, labor, administration, supervision, utilities, claims against the SUBCONTRACTOR, overhead, travel, legal and accounting fees and other costs and expenses incurred by the CONTRACTOR, or for which it may be liable, shall be deducted from the Subcontract price herein stated, and if such expenditures exceed the amount otherwise due to the SUBCONTRACTOR hereunder, the SUBCONTRACTOR agrees to pay the CONTRACTOR on demand the full amount of such excess, together with interest thereon at the rate of 12% per annum (but not to exceed the legal rate allowable by contract if less than 12%) until paid, or, in case of any default on the part of SUBCONTRACTOR, the CONTRACTOR may exercise any other right or remedy available to him. In the event of a breach of this Subcontract or any of its provisions by the SUBCONTRACTOR, resulting in litigation by the CONTRACTOR to enforce its rights, the SUBCONTRACTOR agrees to pay to the CONTRACTOR a reasonable fee for its attorney's services, which fee may be recovered in the same suit as a part of the CONTRACTOR'S cause of action.

### 30. TERMINATION FOR THE CONVENIENCE OF OWNER

Should the OWNER terminate the *General Contract* or abandon the project for any reason, the SUBCONTRACTOR shall be entitled to receive only such compensation as is provided under the termination clause of the General Contract, or in the absence or inapplicability of such clause, the SUBCONTRACTOR shall receive only his pro rata share of any termination payments or salvage received by the CONTRACTOR. In any event, the CONTRACTOR'S obligation or liability to the SUBCONTRACTOR is limited to the amount determined and paid by the OWNER or the pro rata share of any proceeds from the sale, disposal, or salvage of the project.

### 31. TERMINATION FOR CONVENIENCE OF THE CONTRACTOR

Notwithstanding any other provision of this Subcontract to the contrary, CONTRACTOR may, upon written notice to SUBCONTRACTOR, terminate this agreement for CONTRACTOR'S convenience in which event CONTRACTOR shall be liable only for the reasonable cost of SUBCONTRACTOR'S work completed to date of termination in conformity with this agreement plus 15% of such costs for overhead and profit. There shall be deducted from such sum the amount of any payments made to SUBCONTRACTOR prior to the date of termination. SUBCONTRACTOR shall not be entitled to any claim for additional compensation or damages in the event of such termination and payment.

### 32. ARBITRATION

If at any time any controversy shall arise between the CONTRACTOR and the SUBCONTRACTOR with regard to any matter or thing with respect to this Subcontract, including (but not restricted to) the formation of this agreement or the construction of any part thereof, and which the parties do not promptly adjust and determine, or which is not controlled or determined by Section 18 above or other provisions of this Subcontract, then the written orders of the CONTRACTOR shall be followed and said controversy shall be decided by arbitration before the final settlement is made between the CONTRACTOR and SUBCONTRACTOR. Arbitration proceedings will be in accordance with the Rules of the American Arbitration Association; provided, however, where the General Contract between the OWNER and CONTRACTOR provides for arbitration, the methods of appointing arbitrators and proceeding with the arbitration shall be the same as in the General Contract or in accordance with the Rules of the American Arbitration Association, as CONTRACTOR may elect. Judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof. No dispute shall interfere with the progress of the general construction and necessary work shall proceed under direction of the CONTRACTOR. Except for fraud or a decision so grossly erroneous as to imply bad faith the decision of the Arbitrator(s) shall be final and shall be binding upon the parties in dispute. The arbitration proceedings shall be conducted in El Paso, Texas, and the resulting decision shall be a condition precedent to any legal proceedings under the Subcontract, unless waived in writing by both parties to the Subcontract. Award by the panel may include an amount for reasonable attorney's fees.

### 33. DEFECTIVE MATERIALS AND/OR WORKMANSHIP

The SUBCONTRACTOR shall promptly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of the CONTRACTOR, OWNER and/or Architect and their authorized representatives. Should the SUBCONTRACTOR refuse or neglect to proceed at once with the correction of rejected or defective materials and/or workmanship after receiving notice to do so, it is agreed that the CONTRACTOR shall have the right and power to have the defects remedied or changes made at the expense of the SUBCONTRACTOR, and the SUBCONTRACTOR agrees to pay to the CONTRACTOR on demand any and all loss and/or expense paid or incurred by the CONTRACTOR in remedying such defects and/or making such changes, together with interest thereon at the rate of 12% per annum, (but not to exceed the legal rate allowable by contract if less than 12%) until paid, in addition to all other loss, damage and extra expense which SUBCONTRACTOR may become liable for under this Subcontract. The SUBCONTRACTOR warrants that he understands the CONTRACTOR'S Quality Control program and will comply and cooperate fully in achieving required quality levels.

### 34. USE OF CONTRACTOR'S EQUIPMENT

No one in the CONTRACTOR'S employ has any right to grant the SUBCONTRACTOR or his agents, contractors or employees, the right to use or ride on CONTRACTOR'S material hoists or other equipment, except the project manager or executive officers of the CONTRACTOR and then only in writing. The use by SUBCONTRACTOR of any of CONTRACTOR'S facilities including hoisting equipment, material, personnel, or services whether given, loaned, or rented to SUBCONTRACTOR and whether or not operated by CONTRACTOR is subject to SUBCONTRACTOR'S covenant to use, any of the aforementioned at SUBCONTRACTOR'S risk, and to take the same as is, and only after SUBCONTRACTOR is satisfied as to the condition thereof, and SUBCONTRACTOR does hereby agree to indemnify and hold harmless CONTRACTOR from and against any and all claims, damages, liabilities, losses, cost, and expenses (including but not restricted to costs of litigation) arising out of or claimed to have arisen out of death, injuries, or damages to any and all persons and to any and all property in any way directly or indirectly caused or connected with such use of equipment, material, personnel, or services.

### 35. BONDS

SUBCONTRACTOR agrees to furnish CONTRACTOR within ten (10) days from the date of this Subcontract a Subcontract Labor and Material Payment Bond and a Subcontract Performance Bond on CONTRACTOR'S standard printed forms in an amount and with surety acceptable to the CONTRACTOR. The cost of these Bonds is included in the amount shown in Section 3 above. If these bonds are not furnished CONTRACTOR within the required time, CONTRACTOR may terminate this Agreement at any time without notice or obligation for work performed or expense incurred by SUBCONTRACTOR prior to termination.

### 36. EXECUTION AND APPROVAL

This Agreement is subject to immediate cancellation without notice at the option of the CONTRACTOR if not properly signed by SUBCONTRACTOR and received in CONTRACTOR'S El Paso, Texas, office within 10 days after transmittal to SUBCONTRACTOR by CONTRACTOR. This Agreement is subject to approval by OWNER or his representative, and if not so approved will be cancelled without further liability of either party to the other. CONTRACTOR shall have no obligation for any work performed or expense incurred by SUBCONTRACTOR prior to the signing of this agreement by all parties and receipt of written notice to proceed with the work.

### 37. ACTS OR OMISSIONS OF OTHERS

The CONTRACTOR shall not be liable to this SUBCONTRACTOR, his materialmen, laborers, or subcontractors for any damages, loss or expenses sustained by any of them resulting from acts or omissions whether or not negligent, failure to perform, delays in performance, or defaults of another subcontractor, materialmen, or supplier of service in connection with the provision and/or performance of any of the work covered by the General Contract.



38. WAIVER
Waiver of any breach hereof shall not constitute a waiver of any subsequent breach of the same or any other provision hereof.

39. CAPTIONS AND SECTION NUMBERS
The captions and section numbers of this agreement are inserted only as a matter of convenience and are not intended to define, limit, construe or describe the scope or provisions thereof.

40. The Contractor's Quality Control (CQC) shall be a part of this Subcontract. The Subcontractor's Quality Control Plan is subject to approval by Owner and Contractor. This Subcontractor shall designate one of his employees to act as his Quality Control Representative. This Quality Control Representative shall communicate and cooperate at all times with the Project Quality Control Director. It is agreed that this Subcontractor will insert the substance of this clause into any sub tier subcontract.

41. It is specifically understood that this Subcontractor shall comply with all of the conditions of the Safety Requirements of the R.F.P. and Hunt Building Corporation's project Safety Plan, C.Q.C. Plan, Environmental Protection Plan and Storm Water Pollution Prevention Plan. Copies of each are available in the project office.

42. The Owner has assigned a DO-C2 Priority Rating for procurement of critical materials under this subcontract. This Subcontractor shall assign the above mentioned rating to any orders he places for his subcontract and delivery dates shall be mutually agreed upon by the Subcontractor and the Contractor's Project Manager. It is agreed that this Subcontractor will insert the substance of this clause into any sub tier subcontract.

43. It is understood that the Subcontract was awarded on the basis of the Basic Bid, and the amount shown in Section 3 includes all of the Subcontractor's work herein.

44. Submit SHOP DRAWINGS, descriptive literature, and other data required by the specifications as promptly as possible and in no event later than ten (10) days from date of the contract, in twelve (12) copies. No work will start prior to approval of material submittal.

45. During construction, this Subcontractor shall maintain a complete set of As-Builts drawings showing the changes in size, location, or arrangement of any of his work. This information must be transferred onto the Contractor's As-Built drawings weekly. Additionally, any existing utility lines uncovered during construction must be located and included on as-builts. Failure to keep As-Builts current will be cause to withhold payment.

46. Sections 5 and 6 above shall be amended as follows: In making any progress payments, there shall be retained ten percent (10%) of the estimated amount until final completion and acceptance on this work. At that time, the retainage may be reduced to a nominal amount.

47. REQUIRED INSURANCE
(a) The Subcontractor shall procure and maintain during the entire period of his performance under this subcontract the required insurance in conformance with Construction Contract Clause, Item 14:

1a. Comprehensive General Liability: $500,000 per occurrence.

2a. Automobile Liability: $200,000 per person; $500,000 per occurrence; $20,000 per occurrence for property damage.

3a. Workmen's Compensation: As required by Federal & State Worker's Compensation & Occupational Disease Statutes.

4a. Employer's Liability Coverage: $100,000 except in states where Worker's Compensation may not be written by private carriers.

5a. Other as required by State law.

47.   REQUIRED INSURANCE (continued)

    6a.    In no case shall limits of coverage be less than shown on Attachment E.

    6b.    Prior to commencement of work hereunder, the Subcontractor shall furnish to the Contractor a Certificate of Insurance. The policies evidencing required insurance shall contain an endorsement to the effect that cancellation or any material change in the policies adversely affecting the interests of the Government in such insurance shall not be effective for such period as may be prescribed by the laws of the State of California and in no event less than thirty (30) days after written notice thereof to: Hunt Building Corporation, P. O. Box 12220, El Paso, TX 79913-0220.

    7.    Insurance requirements apply to all personnel working on the project site only.

48.   This Subcontractor shall continually clean-up all trash and debris as a result of his work. The clean-up work performed shall be on a daily basis including sweeping or placing it in containers furnished and paid for by this Subcontractor. This Subcontractor shall also perform housekeeping at his storage yard continually to maintain safe and clean working conditions. Clean-up shall be done as directed by and to the satisfaction of Contractor's Superintendent. A clean working condition is required.

49.   Time is of the essence. This Subcontractor shall commence his work when directed by the Contractor and perform work in coordination and cooperation with Contractor and other trades and furnish tools, equipment, and men in sufficient numbers and capabilities to maintain the schedule required of him by the Contractor to meet the scheduled completion date.

50.   Subcontractor shall be responsible for and shall bear any loss or damage to the work and all materials, and supplies until completion of this subcontract, unless such loss or damage results from the actions, fault or negligence either active or passive of the Contractor, its agents, employees, subcontractors, or anyone acting on Contractor's behalf.

51.   This Subcontractor shall provide full time qualified supervision to coordinate and cooperate with the Contractor and other trades on a daily basis.

52.   ADDITIONAL TERMS AND CONDITIONS:
All work shall be done in strict accordance with the General Provisions and the following designated specifications, schedules, drawings, and conditions:

(a)   Request for Proposal N68711-96-C-2324 as amended by Amendment 0002.

(b)   Request for Proposal #N68711-96-C-2324 as amended by Amendment 0002 is to be considered a part of this contract.

The following labor standards numbered one (1) through eight (8) shall be part of this Subcontract and must be inserted in every tier subcontract awarded.

    1)    Davis-Bacon Act (Feb 1995) Determination #CA980001 Modification No. 2, dated July 10, 1998.
    2)    Contract Work Hours and Safety Standards Act - Overtime Compensation (July 1995)
    3)    Apprentices and Trainees (Feb 1988)
    4)    Payrolls and Basic Records (Feb 1988)
    5)    Compliance with Copeland Act Regulation (Feb 1988)
    6)    Withholding of Funds (Feb 1988)
    7)    Subcontracts (Labor Standards) (Feb 1988)
    8)    Contract Termination - Debarment (Feb 1988)

53.   This Subcontractor shall be responsible for turning in payroll reports required by the Davis Bacon Wage Laws in a timely manner. The Owner has the right to withhold payment if payroll reports are incomplete. Hunt Building Corporation hereby informs this Subcontractor that Hunt reserves the right to withhold payment from this Subcontractor in amounts as may be required in order to insure timely submission of payroll reports.

7

ADDITIONAL TERMS & CONDITIONS (continued)

54.   This Subcontractor certifies that he is not currently on the Department of Labor List of Debarred Contractors and that any tier Subcontractors that he uses are not on the debarred list.

55.   This Subcontractor hereby agrees that if he has more than one subcontract with Hunt Building Corporation, payment from any Hunt subcontract may be withheld to satisfy the needs of other Hunt subcontracts.

56.   Subcontractor certifies that he is properly licensed under applicable laws of the State of California to perform the work set out herein and that he will perform this contract in strict compliance will all applicable codes and ordinances.  Additionally, it is understood that all tier subcontractors must also be properly licensed in the state of California.

57.   The bond as called for under Section 35 will not be required under this Subcontract.  Therefore, Hunt Building Corporation will require Waivers of Lien from this Subcontractor's material suppliers and subcontractors evidencing that this Subcontractor has paid for all his materials and labor  including taxes and fringes thereto.  These waivers will be required with each progress payment.

58.   No extras or backcharges are expected to be incurred by this Subcontractor, therefore, unless said extras/backcharges are presented to Contractor within two (2) calendar days of occurrence and acknowledged in writing by an authorized representative of HUNT, said extras/backcharges will not be reimbursed to Subcontractor.

59.   Public Release of Information:

      a. The Subcontractor shall not publicly disclose any information concerning any aspect of the materials or services relating to this subcontract or purchase orders without the written approval of Hunt Building Corporation.  The Subcontractor shall insert the substance of paragraph in each subcontract and purchase order related to this project.

60.   The following attachments are included:

      1.  Attachment A       Work to be done - 4 ea
      2.  Attachment B       Statement and Acknowledgment, Form DD-1413 - 2 ea
      3.  Attachment C       HBC Equal Employment Opportunity Form  - 1 ea
      4.  Attachment D       Business Classification Questionnaire - 1 ea
      5.  Attachment E       Certificate of Insurance Form - 1 ea (sample)
      6.  Attachment F       Statement of Compliance - Form DD879 - 1 ea
      7.  Attachment G       Certified Payroll Form WH 347 - 1 ea
      8.  Attachment H       Sample Payroll - 1 ea
      9.  Attachment I       Instructions for Completing Payroll, Form WH347 - 1 ea
      10. Attachment J       Wage Decisions CA980001, Modification No 2, dated 10/07/98
      11. Attachment K       Executive Order 1246,Veterans Readjustment Assistance Act - 1 ea

      This Subcontractor shall fill out and sign the Statement and Acknowledgment - Form 1413 (Attachment B); Equal Opportunity Form (Attachment C); and Business Classification Questionnaire (Attachment D); attach with your signed contract and return them within ten days of receipt of the contract and prior to start of work.  He shall fill out, sign and return the Statement of Compliance (Attachment F) with the first payroll.  This Subcontractor shall insert all attachments into and make them a part of any other tier subcontract.  He shall comply with such requirements as they apply specifically to his subcontract.  If this Subcontractor is considered a large business (average annual revenues for the preceding three years exceeds $17 million/year) then he shall submit quarterly and semi-annual reports.

*** END OF TERMS AND CONDITIONS ***

ATTACHMENT A - WORK TO BE DONE (continued from page 1)

2.  It is the intent of this Subcontract to include all rough carpentry work necessary to prepare the interiors of the living units for insulation and drywall and the exteriors of the buildings for roofing, stucco and painting. This Subcontractor shall assemble, erect and/or install all framing materials and fasteners including, but not limited to, plates, studs, floor joists, truss joists, ceiling rafters, beams, parallam beams, subfloors, exterior walls, interior walls and partitions, roof framing, roof trusses, blocking panels between trusses, bridging, blocking, wood fire stops, stairs, plywood, APA rated shear panels, APA rated subfloors, APA rated roof decking, wood soffit, fascia, exterior wood trim, wood framing for patio fences, interior fur-downs in all areas shown, gluing and nailing of sub-floor sheathing to joists, fastening of concrete embedments to framing hardware, framing hardware, truss clips and hangers, joist hangers, and the installation of soffit vent and gable end vents.

3.  This Subcontractor shall provide all layout work needed for the rough carpentry work. All doors, trusses, windows and window head flashing shall be installed per the manufacturer's written installation instruction. He shall install sill sealer under all sill plates at exterior walls and exterior doors. Door thresholds shall be properly fastened to the concrete floor.

4.  This Subcontractor shall provide and install all catalog framing hardware as shown on the structural and architectural drawings. Excluded will be truss clips which will be supplied by the truss supplier.

5.  This Subcontractor shall cut and install all drywall backing, truss blocking, freeze blocking and all other backing necessary, including blocking for mechanical equipment, cabinets, wall hung items such as bath accessories, medicine cabinets, shelving, attic access panels, wall mounted door bumpers, etc.. This Subcontractor shall install the wood platform for the furnace and water heater as shown and block for the furnace supply plenum in the floor joists.

6.  It is clearly understood that this Subcontractor will leave the building ready for stucco and roof tiles on the exterior and insulation and drywall on the interior.

7.  This Subcontractor shall receive, unload, handle, distribute and install all materials furnished by Hunt Building Corporation for installation under this Subcontract, including but not limited to, dimensional lumber, plywood, roof trusses, vents and louvers, windows, exterior doors and frames. Included shall be fork lifts in sufficient quantities to maintain the production schedule as determined by the Superintendent. This Subcontractor shall be accountable for all such materials furnished by the Contractor and shall assign one of his men to be in charge and control of all materials furnished by the Contractor. It is understood the windows and sliding glass doors will be assembled, unloaded and stocked by others. This Subcontractor shall schedule all material deliveries with the Superintendent in sufficient advance to not delay the installation of same. He shall either construct racks or provide storage facilities for exterior doors for protection until installation. He shall also be responsible for the continued protection of lumber from the weather.

8.  Hunt Building Corporation shall furnish all dimensional lumber, APA rated sheathing, beams, parallams, truss joist, roof trusses, vents and louvers, sill sealer, window flashing, pre-hung exterior doors with frames, sliding glass doors and windows.

9.  This Subcontractor shall furnish all nails, staples, shots and pins, sub-floor glue, catalog framing hardware and temporary electrical power at Site #2 & #3 only.

10. This Subcontractor shall install the wood surround frame for the garage door as shown on the drawings but is not responsible for installing the garage door or the garage to unit fire door. The gate for the patio fences shall be provided and installed by others.

11. For convenience and safety, this Subcontractor shall install the interior stairs in each unit prior to wall framing on the second and third floors.

12. This Subcontractor shall provide qualified, full time supervision of his work. All of the work performed under this Subcontract shall be accomplished in workmanlike manner by qualified

WORK TO BE DONE (continued on page 10)

9

WORK TO BE DONE (continued from page 9)

personnel experienced in their trade. All of the work shall be plumb, level and square. He shall complete the units in proper sequence and in a timely manner. This Subcontractor shall also be responsible for completing all punch list work in a timely manner keeping this portion of work on schedule just as he is required to do for all other phases of this contract. This item includes establishing a punch list crew and completing the punch lists for each building as prepared by the Quality Control Director and his Inspectors. It is understood that a "phase" prototype will be required. No construction will be allowed past the prototype until it is approved.

13.   This Subcontractor shall provide temporary power in the form of electrical generators for his own work at Sites #2 & #3 only. All electrical generators shall be properly grounded and have Ground Fault Protection.  Water will be available at the nearest fire hydrant at no charge to this Subcontractor.  It may be necessary for this Subcontractor to haul water to his working location.

14.   This Subcontractor shall abide by the Corps of Engineers safety manual, state and federal safety codes for all work performed.  He shall furnish a list of all materials and chemicals used in the performance of his work and furnish copies of material data safety sheets to employees and the project office prior to starting work.  The intent is to fully comply with the current OSHA Safety Regulations and acknowledge that all laborers and mechanics have received the data sheets.  Backup alarms shall be mandatory on all equipment.  Hard hats will be required at all times. This Subcontractor shall designate one employee to be in charge of safety.  This employee shall report directly to the General Superintendent and have authority to immediately correct safety violations and remove persons from the project that are found to violate the safety rules.

15.   This Subcontractor shall notify Hunt Building Corporation in writing and in advance the intent to backcharge any and all subcontractors or vendors working on the project. Without proper notification, backcharges will not be supported by the General Contractor.

16.   This Subcontractor shall not make changes to the approved plans or specifications without the advance written approval from the General Superintendent.

17.   All materials to be incorporated into the project must meet the BUY AMERICAN ACT, FAR Clause 52.225-15. This includes materials under the European Community and North American Free Trade Agreements (Jan.1994). It will be this Subcontractor's responsibility to see that all materials meet this Act.

18.   This Subcontractor shall clean up and dispose of all trash and debris to a dumpster provided by others.  Clean up shall be done as directed by, and to the satisfaction of, the Contractor's Superintendent.  A clean working environment is mandatory.

19.   This Subcontractor shall submit ten (10) complete sets of submittal data as required by the Quality Control Director.  Submittals shall be sent to:

Hunt Building Corporation
100 Wire Mountain Road, Camp Pendleton
Oceanside, CA 92054

Attn: Nate Rutherford

20.   Mail all invoices and correspondence to:

Hunt Building Corporation
100 Wire Mountain Road, Camp Pendleton
Oceanside, CA 92054

Attn: Paco Esparza

WORK TO BE DONE (continued on page 11)

Legal Tabs Co. 1-800-322-3022

Recycled     Stock # EXA-5-B

WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.

ATTORNEYS AT LAW

3 Park Plaza
Suite 1500
Irvine, California 92614

Telephone: 949-852-6700
Facsimile: 949-261-0771

July 13, 2000

**Via Federal Express**

Reliance Insurance Company
3 Parkway
Philadelphia, Pennsylvania 19102

Attention:    Bond Claim Department

Re:    Bond No.:    02772117
      Principal:    Hunt Building Corporation
      Project:    Wire Mountain Family Housing Units & Staff NCO, 272 FHU
      Claimant:    Pacific Commercial Systems, Inc.

Dear Sir or Madam:

Please take notice that Pacific Commercial Systems, Inc. ("PCS") hereby makes a claim against the above-referenced Miller Act Payment bond for work on the Wire Mountain Family Housing Units & Staff NCO, 272 FHU project ("Project").

PCS entered into a subcontract (the "Subcontract") directly with the general contractor for the Project, Hunt Building Corporation ("Hunt"), on or around April 15, 1999. Under the Subcontract, PCS was responsible for the labor necessary for the framing and Hunt was responsible to "furnish all dimensional lumber, APA rated sheathing, beams, parallams, truss joint, roof trusses, vents and louvers, sill sealer, window flashing, pre-hung exterior doors with frames, sliding glass doors and windows." The Subcontract Sum totaled $2,589,000.00.

Unfortunately, PCS was delayed in its work because of a persistent failure by Hunt to provide in a timely manner the trusses and other materials it had agreed to provide in the Subcontract.

When PCS brought this delay to the attention of Hunt's Project Manager and Vice President, Mr. David K. Wray, PCS was unceremoniously terminated from the Project. At the time of the termination, Mr. Wray and other Hunt executives promised that PCS would be duly compensated for the breach of the Subcontract. Nonetheless, an application by PCS for this compensation has been completely ignored by Hunt.

PCS therefore turns to Reliance, the Miller Act payment bond surety for the Project, for payment of the amounts owed by Hunt under the Subcontract. The amount claimed

McLean, Virginia           Washington, D.C.           Florence, Italy

Reliance Insurance Company
Attention:  Bond Claim Department
July 13, 2000
Page 2


by PCS totals $720,000, including interest at the rate of 10%.  Please make the check payable to Pacific Commercial Systems, Inc., and send it to my attention.

In the event payment is not received by July 24, 2000, we will be forced to bring suit in Federal Court against both Hunt and Reliance.

Thank you in advance for your cooperation in this matter.

Very truly yours,

WATT, TIEDER, HOFFAR, & FITZGERALD, L.L.P.

Joseph C. McGowan

JCM/lml

cc:   Mr. Rick Baldan
      Mr. David Wray
      Robert C. Niesley, Esq.

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I. (a) PLAINTIFFS**
THE UNITED STATES OF AMERICA FOR THE
USE AND BENEFIT OF PACIFIC COMMERCIAL
SYSTEMS, INC., a California corporation

**DEFENDANTS**
RELIANCE INSURANCE COMPANY, a Pennsylvania
corporation, and HUNT BUILDING CORPORATION, a
Texas corporation

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** Pennsylvania
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Watt, Tieder, Hoffar & Fitzgerald, LLP
3 Park Plaza, Suite 1500
Irvine, California 92614
(949) 852-6700

**ATTORNEYS (IF KNOWN)**

'00 CV   1516 IEG   (NLS)

**II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)**

40 U.S.C. Section 270(a)

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☒ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | LABOR | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 990 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding
☐ 2 Removal from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

**DEMAND $** 721,800

Check YES only if demanded in complaint
**JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE N/A    Docket Number

DATE July __, 2000    SIGNATURE OF ATTORNEY OF RECORD

JE @ 255-48/520...50